THE STATE v. PAT BREWER, JESSE HARRIS and FRANK KIRBY.

*Homicide—Evidence—Witness—Judge's   Charge—Withdrawal of Appeal.*

1. The defendant in a criminal action ordinarily will be allowed to withdraw his appeal after it is docketed in the Supreme Court, but when the Attorney-General opposes the application good cause must be shown why it should be granted.

2. Upon a trial for murder, a witness testified that immediately after the fatal shot was fired he heard a voice, which he recogzized as that of one of the prisoners, say, "I have got one of the damned rascals;" the cross-examination tended to impeach this testimony; *Held*, that the declaration of the witness, made soon after the killing, that he " knew the prisoner killed deceased," was competent, as corroborative of the statement made on the stand.

3. It is not necessary that the Judge should give instructions to the jury in the words or in the order in which they are requested; it is sufficient if they are fairly and intelligently presented to the jury.

4. No question having been made by the prisoner, upon the trial, as to the character of the weapon (a pistol) with which the killing was done; *Held*, that an instruction to the jury that they must be "satisfied beyond a reasonable doubt that the deceased was killed by a pistol shot," without instructing them that the pistol was a deadly weapon, was not error.

5. When the evidence presents more than one aspect of the case it is the duty of the Judge to submit each one to the jury as clearly as he can, without expressing an opinion.

6. Where the testimony tended to show that one of the prisoners fired the fatal shot from an upper window, late at night; that the other two prisoners, on the approach of the deceased and his friends, went up stairs with their comrade, some of them having pistols; that the firing commenced immediately, and there was other evidence tending to show that the prisoners were making common cause; Held, not to be error in the Court to refuse to charge that there was no evidence to go to the jury that the two were present in the room when the shooting was done.

(State v. Leak, 90 N. C., 655; State v. Lee, 91 N. C., 570, and State v. Whitfield, 92 N. C., 831, cited).

This was an INDICTMENT for murder, tried before *Phillips*, *Judge*, at March Term, 1887, of ORANGE Superior Court.

The prisoners were convicted of manslaughter, and from the judgment thereon appealed.

The State examined W. J. Fleming as a witness, who tesfied in substance, as follows:

I am a student at the University; was there 9th of October; knew Jacob A. Frieze, the deceased; first met Pat Brewer that night at the house of Jack Barbee; met Morris (who is not a student) at rock wall at Campus gate; Marshall was with me; Morris was drunk; Marshall and I went with Morris to take him home; started with him and got in front of Jack Barbee's house where he stopped, and Marshall and I went back to corner of yard on street; some negroes came out, about four, I suppose, and asked if we were looking for Pat Brewer? I told them we were not—"is he here?" About that time a negro came out, and said his name was Pat Brewer, and began cursing; he was conspicuous, and had a pistol. I recognized Pat—I did not recognize any of them except Pat and West Merritt; Marshall said, "come, it will never do to stay here." I was of the same opinion, and we started off, got a little way, and they threw rocks at us. We

went to College and to Woodson's room, and told him we had been cursed, assailed and rocked by negroes, and asked him to go back with us. Woodson got up, put on his clothes and went over to the South building and got a pistol; I think I went to my room where Frieze was and told him the same in substance as I told Woodson. We then went to Sapp's room or Foust's, and every one was told the same thing. They got up and went with us—Frieze, Sapp, McKeever, Foust, Marshall, Woodson and myself, seven in all— went to ascertain what the negroes meant by rocking us and who they were; we went to my room on the way, and from thence to Jack Barbee's; called for the proprietor of the house, Jack Barbee. We understood he was the proprietor; two story wood house. Jack Barbee came out and we asked him who had been rocking the students? I can't tell what his answer was; asked him if Pat Brewer was there? Don't know what his exact answer was, but the substance was that Brewer was there; we had some talk. Pretty soon some shooting commenced upstairs. Prior to that there were no threats as I heard. I was standing doing nothing; some of the others were talking; all of us in the yard. We were not together; Woodson, Frieze and myself were in a row, and the others, I suppose, were behind ten feet. A good many shots were fired; first shot nobody was hit; first a single shot, next a volley or a number of shots from the window upstairs to my left; then in quick succession another volley from the same place; in that volley Frieze was shot. After Frieze was shot I was hit, and I stepped back a step or two and drew a pistol, got a bead on the window, and commenced firing, and as soon as my pistol stopped firing I left. I went as far as the Baptist church and examined to see if I was much hurt; went to Withers' room and got some cartridges and loaded the pistol. I went back to Frieze and thought he was dead or badly wounded; went for Dr. Mallett, who went to Barbee's house, and we picked Frieze up

and carried him to a house near Baptist church, and laid him on the porch.　There were fifteen or twenty negroes in and about the house.　I recognized Pat Brewer; he said he was Pat Brewer; I didn't see him when the shooting was going on.　Frieze exclaimed, " my God, boys, I am shot!"　A voice from the window said, "I have got one of the God damn rascals," or words to that effect; I recognized that voice as the voice of the man who told me his name was Pat Brewer when I met him that night.　I do not know what negroes were there; there had been no firing from any of us until they fired on us from the windows.　When we were talking to Jack Barbee on the steps at the door there was a yellow negro behind him in the door, but I don't know who it was.　There was considerable shuffling in the house while we were standing out doors.　Frieze was shot in the breast. I did'nt recognize any but Pat Brewer except West Merritt, who I met, for the first time, when we were rocked.

Cross-examined.—The shooting took place the 9th of October last—Saturday night; moon shining brightly; I boarded at Mrs. Davis'; after I got supper I went to college; then went to the Christian Association; thence to my room; thence to Dr. Robinson's Hotel; didn't stop long; from Robinson's Hotel I went up the street; don't know who was in the crowd.　Brooks Brewer's shop is next to Jordan Weaver's; I stopped at Weaver's to get a glass of cider; I saw Pat Brewer at a house said to be Jack Barbee's.　I didn't see Pat at Jordan Weaver's shop.　From Weaver's I went west by myself; I went to Kirkland's corner; my purpose in going there was simply to take a walk; went from Kirkland's to campus gate and met Marshall; I didn't meet Frieze, McKeever and Woodson, and had not heard of any difficulty.　I can't say that I heard of the difficulty going to Jackson Barbee's or after I told Woodson Pat was at Barbee's.　I did not send word to Pat Brewer that we were going to give him a dose of the same that we had given Jim Weaver; no one else did

in my hearing, and I heard all the talking that was done. I didn't, a short while before the homicide, go with Woodson and others to Simon Battle's or Hilroy Bynum's to wait for Pat Brewer. I had no whisky; I was not drunk; Marshall was not drunk; Morris was drunk; didn't go to Morris and tell him to get us whisky; didn't go for whisky; did stop on the street in front of Morris' shop; Morris had no liquor that I saw; didn't tell us to go to Barbee's to get whisky. We got in front of Barbee's, and Morris stopped and said he wanted to see some darkies; we were taking him home; didn't know that Morris lived in the shop. I had drunk one glass of cider—no wine or whisky. Morris couldn't make much progress, and we supported him. Neither Morris, Marshall or I went into Barbee's yard; Morris didn't tell us to wait at the gate and he would go in and get some whisky for us; I stopped back at the corner. I didn't demand to know if Pat Brewer was there. Morris was at the gate; I didn't want to stand there while they were in conversation, on account of the appearance of the thing. Some negroes asked if we wanted to see Brewer; said we didn't; I did not have a pistol. Marshall did not take me off. Did not tell Pat we would get him; had no conversation with Pat Brewer; came out and said his name was Pat Brewer and commenced to curse us. Morris did not leave when I left. Marshall said, when Pat began cursing, "we must leave," and I thought so too. From the gate to Barbee's house was about ten steps; Frieze, Woodson and I went up to the door, Woodson standing to my left; I was somewhat to the right of the door; Frieze was to the right of me; didn't throw any rocks at the house; don't know who came to the door; we asked for the proprietor; the proprietor stepped out on the steps; after that I asked if Pat Brewer was there; in substance he said he was; Woodson did not say that Pat was there and he intended to have him—heard no words to that effect. The shooting began from window

upstairs. Neither one of us went into the house before the
shooting. I did not see Jesse Harris. I was three steps from
the house when the firing commenced. I got in the walk
before I began firing at the window; I saw nobody in the
window when I fired. We all got a pistol before we went
down to Barbee's; I didn't say that Frieze had two pistols;
I heard that he had. I don't know where Pat Brewer lives;
didn't know that he lived in a kitchen in Pritchard's yard;
I never went there and demanded that Pat Brewer's wife
should come out, or Pat himself. I don't know any of the
students who fired but myself; I fired after I was hit; I was
hit after Frieze was shot; I was shot at the third volley.
The first time I ever heard Pat Brewer's voice was at Bar-
bee's, on the occasion of the rocking; the second time, later
in the same night, when the shooting was heard. My object
in going to Barbee's house that night was to find out the
names of the negroes and see what they meant by rocking
us; I can't say what would be done next; my purpose was
to defend myself if necessary; my sole purpose in going to
Jackson Barbee's house the second time that night was to
get the names and see what they meant by rocking us; I
supposed Pat Brewer would be there. I don't know Pat
Brewer's wife; never spoke to her; have seen a woman who
they said was his wife. It was about an hour and a half
from the time I left Jack Barbee's house until I went back.
I was sober; our purpose was to ascertain who it was that
rocked us and why they did it; that was understood amongst
us to be our only purpose.

West Merritt, a witness for the State, testified substantially
as follows:

Live at Chapel Hill; recollect the night Frieze was shot;
was there when Morris and two students came; I had started
down the street; met Morris at the fence, who asked me if
Pat Brewer was there; I said I didn't know; Jesse Harris
said, "if you want to see Pat Brewer I reckon you can find

him." Jesse went into his house and brought Pat to the fence, and Morris told him to step across the street; Pat said he wouldn't do it—if he wanted to see him, see him there; Jesse told him to get over the fence and see what the man wanted; I didn't see him have anything. Morris and the students then left; in about half an hour Morris came back by himself and inquired for Pat Brewer. Jack Barbee, Frank Kirby, Bill Lynn, Pat Brewer and myself were there when the students came; I was in the house when they came back the second time; Pat Brewer said the students had come, and he and Jesse Harris and Frank Kirby went upstairs; Frank Kirby didn't have anything, but had his hand in his hip pocket; the others had two pistols. I was in the house and heard the firing; there was such a row I could not tell what was going on around me; the noise was out of doors and up above; I was down stairs in the passage when the first fire was made, and they got to shooting so I leant up against the door. They went upstairs as soon as the students came; I saw Pat Brewer come down with a pistol in his hand after Frieze hollered; he made at Woodson, who was then in the house, and snapped his pistol once or twice at him and told him to get out—he was after him to-night. Jack Barbee and Alice Brooks lived in the house down stairs; the upper rooms were not occupied. A minute or two after the parties got upstairs the firing commenced; none of the students had come in the house when these parties went upstairs; Jack Barbee was standing in the door.

Cross-examined.—Don't know who the students were who came with Morris; don't know whether the students were drinking or not; think Morris was; students were across the street; they and Morris went off together; Morris told Brewer to step across the street, and Jesse told him to go; Pat got over the fence. I heard Pat say the students had come; he was in Jack's room, and had stepped out into the passage and started upstairs, and said the students had come; stu-

dents then came in the yard and asked Jack who it was that rocked the students; Jack told him it was Jesse Harris, Pat Brewer and me that rocked the students. Didn't hear Jack tell Woodson that his wife was sick and he didn't want him to come in. Pat Brewer, Jesse Harris and Frank Kirby were all that I saw go upstairs; wouldn't say whether the firing commenced upstairs or out of doors; in a very short time Frieze hollered out he was shot; I saw no one but Pat come down stairs; Woodson was in the door; I didn't see him do anything but run. I didn't throw any rocks at the students, nor did I see any rocks thrown at them, and I was out there from the time Morris came until he and the students left. I was indicted in this bill. I was in the house sitting down eating eggs when the students came. I went to Jack's that night to get some liquor from Bill Lynn; I got it; I never got liquor there before. I never heard Woodson threaten to whip Pat Brewer. Pat Brewer lived on the other side of town, in a house on the Askew lot. I don't know what Pat was doing at Jack Barbee's that night; I had no pistol; I don't remember seeing Ella Brewer there that night.

Re-direct.—There were two doors to Jack's house—one front and one back door. The magistrate bound me over as a witness, and at the last term of the Court I was put in the bill and arrested; nobody stood my security; I was just turned out. I didn't see any other parties about the house, and when I came out of the house I didn't see anybody about the yard.

Several other witnesses, introduced by the State, testified substantially to the same facts.

Dr. Mallett, a physician, who examined the deceased soon after the shooting, was asked by the State, what did the witness Fleming "then tell you?" To which he replied: "Fleming said he knew that Pat Brewer killed Frieze." To this inquiry and response the prisoners objected.

The prisoners offered no testimony.

*The Attorney General,* for the State.
*Mr. A. W. Graham,* for the defendants.

MERRIMON, J.   After the appeal in this case had been docketed, called regularly for argument and argued, and the Court had considered of the errors assigned, two of the appellants presented their application, signed by them respectively and approved by their counsel, asking that they be allowed to withdraw the appeal as to themselves, and their counsel submitted a motion to that effect, which the Attorney General opposed.

No cause is assigned in support of this motion; it seems to be expected that it will be granted as of course.   This is a misapprehension of the rule applicable.   The appellants having brought their appeal to this Court, the latter has jurisdiction thereof for all proper purposes, and may, in the exercise of a sound discretion, grant or refuse their motion. The Court will ordinarily, with the assent of the Attorney General, grant such a motion, but it will not when he opposes it, unless just and reasonable cause be shown why it should be allowed.   The course of procedure in an action is serious, and must be observed and pursued until it shall be completed, and a party to it cannot abandon or rid himself of important steps taken in it without the consent of the opposing party or for .cause shown, and with the sanction of the Court.   And this is so in criminal as well as civil actions. Courts are serious and practical tribunals that do not tolerate the mere whim or caprice of litigants; a reason or cause should prompt every step in the course of an action.   No cause has been shown in support of the present motion, and it must be denied.   *State* v. *Leak,* 90 N. C., 655; *State* v. *Lee,* 91 N. C., 570.

The single objection taken at the trial to the admission of evidence is not well founded.   Obviously one purpose of the cross-examination of the witness Fleming—a witness for the

prosecution—was to impeach him as to his testimony. It was therefore competent to corroborate him in that respect by producing evidence that he had, before the trial and his examination, made statements the same in effect, or substantially the same, as he made on his examination in respect to some material matter of fact. *State* v. *Whitfield,* 92 N. C., 831. His testimony tended to prove that the prisoner, Pat Brewer, on trial, discharged the fatal shot; he said that he saw the prisoner just before the firing began, and the latter told him that his name was Pat Brewer; that immediately after the fatal shot he heard a voice from the upper window of the house from which the shots came, which said, " I have got one of the God d—d rascals," or words to that effect. I recognized that voice as the voice of the man who told me his name was Pat Brewer, &c.

The corroborating witness, who examined the body of the deceased just after he was killed, and who then saw the witness sought to be impeached, was asked the question, " What did witness Fleming tell you?" His answer was—the the prisoner objecting—" Fleming said he knew that Pat Brewer killed Frieze." This was not a very important fact, but it tended in some degree to corroborate the witness as to the account he gave of the presence of the prisoner Brewer in the house, and what he said he had done just after the fatal shot. The testimony of the witness on the trial went to prove that the prisoner killed the deceased, and his declaration theretofore made that he had done so was corroborative and therefore competent.

We are of opinion that not one of the numerous assignments of error as to the instructions the Court gave the jury can be sustained. The appellants' counsel asked the Court to instruct the jury that they must " be satisfied beyond all reasonable doubt that the defendants, or some one of them, fired a shot which killed" the deceased. If it be granted that this request was proper, the Court gave it in substance

repeatedly.   In one connection it said, "your first inquiry is, did the prisoner, Pat Brewer, Jesse Harris and Frank Kirby, the appellants, or either of them, inflict a wound with a pistol shot in and upon the breast of Jacob A. Frieze, and that his life was taken by that shot, and the State has proven this to your satisfaction and beyond a reasonable doubt," &c. In another connection it said, "the State must show to you beyond a reasonable doubt that Jacob A. Frieze was killed by a pistol shot, and that the defendants, or some one of them, did the act," &c.   The Court was not bound to give the instruction asked for in its very words; it was sufficient to give it in substance as it did.   Nor was it necessary to give it in the order and connection asked for; it was sufficient to give it fairly, so that the jury could understand and properly apply it, as the Court certainly did.

That the Court failed to instruct the jury, in a particular connection, that "the killing must be proven to have been done with a deadly weapon," is assigned as error.   The evidence went to prove that the deceased was killed by a pistol shot, nor was there any evidence to the contrary.   The Court told the jury in a proper connection that they must be satisfied beyond a reasonable doubt that the deceased was killed by a *pistol shot*, and they could not mistake that this was a material part of the inquiry.   No question was made on the trial as to the weapons used by the prisoners, and it was sufficient for the Court to instruct the jury, as it did, in that respect.   The pistol was manifestly a deadly instrument, and it was not necessary that the Court should so specially designate it.

It is not necessary to pass upon the correctness of the instruction as to the aspect of the case in which the Court told the jury that the prisoners would be guilty of murder, because there was a verdict of guilty of manslaughter.   There was nothing in the instruction that could mislead the jury or prejudice the prisoners in other aspects of the case.

It is assigned as error that the Court stated to the jury a "hypothetical case." This is a misinterpretation. The Court only presented two views of the case, clearly warranted by the evidence, that facilitated the inquiry to be made by the jury. A chief object of the instructions from the Court is to help the jury to a just and intelligent view of the issue before them, without intimating any opinion of the Court as to the weight of the evidence. When the evidence presents two or more aspects of the case, it is proper—certainly not error—for the Court to carefully direct the attention of the jury to them.

The Court was further requested to instruct the jury that there " was no evidence that Harris and Kirby (two of the appellants) were in the room from which the fatal shot was fired." This it properly declined to do. The witness Merritt testified intelligently, and that " Jack Barbee, Frank Kirby, Bill Lynn, Pat Brewer and myself were there when the students came, and he and Jesse Harris and Frank Kirby *went upstairs.* Frank Kirby did'nt have anything, but had his hand in his pocket. The other two had pistols. I was in the house and heard the firing. * * * * A minute or two after the parties got upstairs the firing commenced." There was other evidence tending to show that the prisoners named were about Pat Brewer and the house mentioned, making common cause with him at the time the fatal shot was fired. Clearly there was evidence from which the jury might reasonably infer that they were in the room referred to at that time.

We have carefully examined the record and discover no error therein, and we declare that there is none.

Let this be certified to the Superior Court according to law.

Affirmed.